Filed 12/22/15  P. v. Le CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049863 |
| v. | (Super. Ct. No. 09WF2495) |
| KHANH VAN LE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

*                *                *

INTRODUCTION

Defendant Khanh Van Le appeals from the judgment entered after a jury found him guilty of the second degree murder of Anh Tuan Nguyen.[1] The jury found true that Le personally used a knife within the meaning of Penal Code section 12022, subdivision (b)(1) in the commission of the murder.

We affirm. First, the trial court did not err by denying Le's motion for a mistrial after a brief portion of a police interview of a witness was mistakenly played for the jury. The court promptly discovered that an unredacted version of the interview had been played, stopped further playing of that version, and appropriately admonished the jury to disregard the original recording. The correct redacted version of the interview was thereafter played for the jury. In any event, Le was not prejudiced by the playing of the unredacted recording.

Second, the trial court did not abuse its discretion by excluding evidence of Anh Tuan's arson convictions in 2000 and 2006 or by excluding evidence that on three to four occasions in 2000, Anh Tuan struck his boyfriend after he had been drinking. The proffered evidence did not constitute evidence of Anh Tuan's "character or a trait of character" within the meaning of Evidence Code section 1103, subdivision (a)(1), relevant to Anh Tuan's conduct in the instant case. (All further statutory references are to the Evidence Code unless otherwise specified.) In addition, the trial court did not err by concluding the probative value of the excluded evidence was substantially outweighed by the possibility its admission would necessitate an undue consumption of time or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury, within the meaning of section 352.

---

[1] Several of the witnesses share the same last name, Nguyen, with the victim. We refer to those witnesses by their first names and Anh Tuan Nguyen as Anh Tuan. We do so for the purpose of clarity and intend no disrespect.

2

Third, even if we were to assume the court erroneously overruled Le's counsel's objection to the introduction of a video recording discussed in the Discussion section, part III, *post*, any such error was harmless.

Finally, the record does not reflect cumulative error.

FACTS

During the evening of December 13, 2009, Binh Nguyen, a fisherman who worked on a boat named Saigon, was called by other fishermen to join them at Saigon's Towing in Garden Grove, an automobile repair shop. Binh went there with Jenny Do. Binh lived with Do and called her his wife, although they were not legally married. Anh Tuan, who worked with Binh on the same boat, and Le were also at Saigon's Towing.

Binh knew Le because Le lived with Binh's ex-wife, Thao Nguyen. Binh and Thao had four children together, including then 14-year-old D., 11-year-old N., and two-year-old E.

Le, Binh, and Do were seated at the same table when Do asked Le how Thao was doing. In asking her question, Do "did not use a term in Vietnamese called Chi" in referencing Thao. Le became upset; he raised his voice. He told Binh to go home and "ditch" his wife because she was disrespectful. He also told Binh to take Do home and "teach [his] wife." Binh remained sitting there, smiling.

The police were called because of the loud argument and two officers of the Garden Grove Police Department arrived at Saigon's Towing. There was no sign of a physical fight, injury, or damage; people were laughing. Binh told Officer Jeff Mooney that he had been involved in an argument with a friend who had since left and that it was a mistake the police had been called. The officers left.

Le went back inside Saigon's Towing. Shortly thereafter, Thao, D., and N. showed up at Saigon's Towing; the three of them yelled and cursed at Binh and Do. Le

3

threatened to beat up Binh. Thao and D. threatened to beat up Do. Binh raised a beer bottle and tried to swing it at D., but missed.

Anh Tuan told Le to leave. Le refused. Anh Tuan and two or three other men forcibly removed Le from Saigon's Towing. Le "deflected" Anh Tuan's arm, and Anh Tuan lost his balance and fell. Anh Tuan became angry and punched Le in the mouth.

The police were called again. It had been about 20 minutes since the officers had left Saigon's Towing following the first call. When Mooney arrived, he saw several people standing in front of Saigon's Towing. A van, traveling southbound, stopped in front of Saigon's Towing; Mooney saw a woman and two children inside the van. Le got out of the van and told Mooney that he had been involved in an argument earlier and had left, and that when he came back, during an argument, he got punched in the mouth. Mooney saw that Le's lower lip was swollen and bruised. Le told Mooney that he wanted Mooney to be aware of what had happened, but he did not want him to do anything about it. The officers waited for Le to leave. Le got back into the front passenger side of the van and left.

After Le got into the van, he told Thao he wanted to go to his friend's apartment. She drove to the friend's apartment and waited for Le. After Le got back into the van, Thao drove by Saigon's Towing; Le had been on the phone talking to someone. Thao pulled the van over to the curb. Le jumped out of the van, and said, "I have to give a regret back to somebody."

Anh Tuan's white van was stopped at a stop sign near Saigon's Towing. Le walked to Anh Tuan's van, opened the driver's door, and made a thrusting motion with his arm. Anh Tuan fell out of his van and "down on to the ground" from the driver's seat; he was still wearing his seatbelt. A man ran to Anh Tuan. Anh Tuan said, "I was stabbed." Anh Tuan was pronounced dead by paramedics who responded to the scene.

4

Le returned to his van. Thao asked him what he had done, and Le said, "[n]othing." Le later said he had killed somebody, he had stabbed someone with a knife, and there was nothing to worry about because he threw the knife down the drain.

An autopsy performed on Anh Tuan's body showed he had been fatally stabbed in the heart and had also been stabbed in the back, partially severing his spinal cord.

*Defense Case*

Le testified he had asked Thao to drop him off at Saigon's Towing so that he could talk to someone there about getting a job. As he was walking down the street toward Saigon's Towing, he saw Anh Tuan stop his vehicle and get out. Anh Tuan grabbed Le by the shirt collar, and said: "Now, you come back here. You want to fight again?" Le testified that he had responded, "I don't want to fight. I only want to find a job for me." After Anh Tuan did not release Le, Le pushed his hands away.

Anh Tuan reached into his van, turned around, and again grabbed Le's shirt collar. Le saw that Anh Tuan was holding a knife and was making stabbing motions toward Le's stomach. Le knocked the knife out of Anh Tuan's hand. Anh Tuan continued to hold Le by the shirt collar while they struggled to get the knife. Le picked up the knife. He told Anh Tuan to let him go, but Anh Tuan did not.

Le stabbed Anh Tuan in the stomach and when Anh Tuan still would not loosen his grip, Le stabbed him in the back. Le then ran away and threw the knife. He called Thao to pick him up. When Thao picked up Le, D. and N. were in the car.

Le admitted that he had lied to the police when he said he did not walk back to Saigon's Towing, did not see a white van, and never stabbed anyone.

5

## PROCEDURAL HISTORY

Le was charged in an information with the murder of Anh Tuan in violation of Penal Code section 187, subdivision (a).  The information alleged, pursuant to Penal Code section 12022, subdivision (b)(1), and within the meaning of Penal Code section 1192.7, that Le personally used a dangerous and deadly weapon, namely, a knife, in the commission of the murder.

The jury found Le guilty of murder in the second degree.  The jury found true the allegation that Le personally used a knife in the commission of the murder.  The trial court imposed a total prison term of 16 years to life.  Le appealed.

## DISCUSSION

### I.

### THE TRIAL COURT DID NOT ERR BY DENYING LE'S MOTION FOR A MISTRIAL.

Le contends the trial court erred by denying his motion for a mistrial after a portion of an audio recording of N.'s police interview that was to have been redacted was played for the jury.  For the reasons we explain, the trial court did not err by denying the motion.

We review the denial of Le's mistrial motion for an abuse of discretion. (*People v. Montes* (2014) 58 Cal.4th 809, 884.)  "A motion for mistrial is directed to the sound discretion of the trial court. . . . '[A] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)

6

During trial, N.'s testimony conflicted in certain respects with statements she had made in an interview with Detective Edwin Wilson the day after the stabbing. The prosecutor sought to impeach N. by playing the audio recording of that interview to the jury and providing the jury with a transcript. The trial court suggested that the prosecutor and Le's counsel discuss what portions of the recording should be redacted. The court stated, "when day is done and all redactions have been done not only to the transcript but also to the CD [(compact disc)], I will expect both of you to have read and listened to—read the transcript and listened to the tape so that you can orally confirm in court that you not only have done so—that the proper redactions were made so we don't accidently give the jurors something that they should not hear."

When court was back in session, the trial court stated: "Before we bring the jurors in, I just wanted to confirm that the proper redactions have been made to the recording that we went over last week. That: one, the proper redactions have been done to the transcript; and, two, the proper redactions have been done to the audio tape; and both counsel have confirmed that and signed off on that." The prosecutor and Le's attorney each responded, "[y]es."

Wilson was the last witness whom the prosecutor called in the prosecution's case-in-chief. The trial court admonished the jury that the audio recording of N.'s interview "is evidence . . . [i]f there is a conflict between the CD and the transcript."

The reporter's transcript shows that after the audio recording began playing, the court interrupted, stating, "[o]ne second. [¶] All right. Ladies and gentlemen, we're—ladies and gentlemen, we're going to take a break, morning break for ten minutes." During the interview, N. was heard telling Wilson that when Le returned to the van after the stabbing, "[h]e acted very different" and "like he's telling lies to us." Wilson then asked N., "[w]hat was he saying?" and N. responded: "My mom asked him what did he do and he said, 'Nothing.'" The audio recording continued with the

7

following four lines (as set forth in the transcript) that were supposed to have been redacted from the audio recording played for the jury:

> "DETECTIVE WILSON:  Do you believe him?
>
> "N[.]:  No.
>
> "DETECTIVE WILSON:  Why don't you believe him?
>
> "N[.]:  Because he always lies."

Out of the presence of the jury, the trial court asked the prosecutor what had happened, and the prosecutor responded, "[w]e played the wrong disc" and "I have no excuse, Your Honor.  If I could explain it, I'd explain it.  Obviously, I screwed up."

Le's counsel moved for a mistrial, stating, "I don't believe that you can unring the bell.  What was sent to me, obviously, and provided to me in the form of transcription and also the CD was not what was played in court.  And I think after that statement—and obviously the court had to take a break given that the redactions weren't made as they should have been, I don't believe it's something that can be unrung or unheard."

The trial court stated, "[l]et's make a clear record.  [¶] Previously, in court exhibit number 7 on page 10, the court previously ruled lines 6 through 11 [(quoted *ante*)] should be redacted.  It would appear the beginnings of that—it would appear that in playing the CD to the jury, that it looks like lines 6 through 9 were—unfortunately got played.  And then it was . . . immediately stopped thereafter."

The trial court further stated the motion for a mistrial was denied at that time, explaining:  "Again, the items that were audibly heard will be redacted as they should have been to begin with and counsel is going to also listen to the whole transcript to guarantee that all that we previously went through and indicated is going to be redacted was to be redacted.  And, again, they will be given not only a transcript that at least at this point as I've been able to follow along seems to be accurate, but also will be given a CD that is accurate."

8

The court asked Le's counsel, "are you requesting any admonishment or anything further by this court to this jury or would that be something that would maybe highlight something?" Le's counsel asked for time to think about it. The court stated: "Think about it. If there's something you would like me to say to the jury, I'd be more than happ[y] to do so. The court, at least initially at this time, feels that its admonishment that it gave when the transcript was being passed out and . . . prior to the CD being played that would be sufficient to restrict them just relying on the CD—a properly redacted CD that we, again, make sure happens and this transcript itself. But if you think there's anything further you'd request the court to give anything further, I'll be more than happy to look at that."

The court confirmed with counsel that the correct redacted written transcript had been provided to the jurors. The court stated it would "hold both counsel responsible for having heard the new CD to make sure the redactions are done. I'll give counsel a verbal acknowledgement that they did such." The court expressed frustration at the situation, noting, "I don't know how many more safeguards I can put out there and ask folks to double-check things only to have mistakes made like this. [¶] Luckily, it was only about three sentences. We captured it quickly."

When the jury returned, the court admonished the jury,[2] as follows: "Ladies and gentlemen, I'm going to indicate to you that I'm going to ask you to disregard the previous recording that you heard. There were 3 or 4 sentences that the court had previously ruled inadmissible and that were ordered redacted and were accidently played in violation of court order. You are to disregard what you heard. We have reviewed your transcripts. Your transcripts are correct, and so you can keep those. [¶] And we will play the interview once again from its beginning. And, again, please

---

[2] The record does not show whether the court's admonishment included anything suggested by Le's counsel, or whether Le's counsel made any recommendation to the court regarding the content of the admonishment.

9

don't forget that the transcript you have is an aid to assist you in listening to the CD. The CD itself is evidence and controls. If there, if there is a conflict between the CD and transcript, the CD again prevails. Again, you may keep a copy of that transcript, make notes or use it for clarification or as an aid to recollection. [¶] So we'll mark now as People's 55, the taped interview and start that from its beginning, if we can, [prosecutor]."

Le argues the trial court's admonishment to the jury was insufficient to protect him from the damage caused by the improperly admitted evidence. He argues: "N[.]'s un-redacted statement was devastating to [Le]'s defense in two important respects: (1) Because [Le] asserted he killed [Anh Tuan] Nguyen out of self-defense, [Le]'s innocence depended upon the jury's belief of his version of events; N[.]'s un-redacted statement directly undermined [Le]'s believability; (2) Because N[.] and [Le] had a close fatherly-relationship, any *negative* characterization N[.] attributed to [Le] (i.e., 'always lies,') necessarily appeared to be unbiased, and thus was likely afforded additional weight by the jurors."

As our Supreme Court has explained, "'[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when "''a [defendant's] chances of receiving a fair trial have been irreparably damaged.'"'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

Here, the trial court promptly addressed the playing of the unredacted portion of the audio recording and admonished the jury to ignore the earlier recording. "We presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) The written transcript that was given to the jurors had been properly redacted.

10

Le was not prejudiced by N.'s "he always lies" comment in light of other evidence showing Le not telling the truth in several instances. The jury properly heard the portion of the audio recording in which N. told Wilson that Le had acted like he was "telling lies."

Le admitted, during his trial testimony, that he had "lied throughout the course of [his] interview with police officers when [he] said he [was]n't involved in a stabbing." Le testified that he had lied when he told the police officers he (1) had not seen anyone in a white van; (2) had not walked back to Saigon's Towing the night of the stabbing; (3) went straight home after getting hit a second time at Saigon's Towing; and (4) never stabbed anyone and had not been involved in the stabbing of Anh Tuan.

In any event, the effect of N.'s statement that Le "always lies" was undermined by her other statements to Wilson in the audio recording, which showed Le had also told the truth about his role in the stabbing. The jury heard N. tell Wilson that on the night of the stabbing, after Le returned to the van, he stated that he had killed somebody and stabbed the person "a lot." N. also told Wilson that Le said he was hiding the knife and "threw it somewhere." The trial court did not err by denying Le's motion for a mistrial.

## II.

### THE TRIAL COURT DID NOT ERR BY EXCLUDING EVIDENCE OF ANH TUAN'S PRIOR ARSON CONVICTIONS AND DOMESTIC VIOLENCE HISTORY.

Le contends the trial court erroneously excluded evidence of Anh Tuan's two arson convictions and Anh Tuan's history of domestic violence, in violation of rights to confrontation, due process, and a fair trial. "We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard." (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

11

Before trial, in order to show Anh Tuan was violent when he drank and acted in conformity with his "character" or "trait of character," within the meaning of section 1103, subdivision (a)(1), on the night of the stabbing, Le's counsel sought to admit evidence of (1) Anh Tuan's convictions in 2000 and 2006 for arson, and (2) incidents in which Anh Tuan hit his boyfriend after he drank alcohol.

Section 1103, subdivision (a) provides in relevant part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." Even if proffered evidence is relevant and admissible under section 1103, the trial court may exclude such evidence under section 352. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456-1457.)

Le's counsel's offer of proof included that in 2000 and again in 2006, Anh Tuan started a fire. In 2000, Anh Tuan started a fire after an argument with his former boyfriend, Jefferson Tran. In 2006, Anh Tuan set a fire because he wanted to kill himself. Le's counsel also sought admission of evidence that Anh Tuan engaged in domestic violence against Tran after Anh Tuan had been drinking.

The court held a section 402 hearing at which Tran testified he had been in a romantic relationship with Anh Tuan and that Anh Tuan had started a fire in 2000 and again in 2006. Tran testified that in 2000, Anh Tuan started "drinking a lot." Anh Tuan would hit Tran when he refused Anh Tran's request for money to buy beer. Anh Tuan drank 12 to 13 bottles of beer at one time. Over the course of their entire relationship, Tran hit Anh Tuan three or four times and those incidents occurred in 2000. Tran never knew Anh Tuan to hit anyone else.

After the hearing, the trial court excluded Le's proffered evidence on the ground it was not admissible under section 1103, subdivision (a) or section 352. The

court stated: "[H]aving heard all the evidence proffered in the 402 hearing as well as argument by both counsel, the court is not going to find that it is admissible under 1103(a)(1). [¶] I don't necessarily—I mean, while the evidence may be deemed competent, it certainly is not substantial; and its value, at best, is minimal, if not slight in the relevance category. And does not appear to rise to a level where it would—I guess, could be characterized as one's character or trait of character. [¶] We have an incident that happened nine years ago. It seemed it only happened during a particular scenario, that being the decedent maybe being becoming upset because the witness, Mr. Tran, would not proffer up additional money for additional alcohol. But it would appear that behavior, the few times it did happen back in 2000, which was nine years ago from the date of violation in this case, didn't seem to be a factor later on when they reestablished their relationship, for whatever reason. But it appears apparent the reason was if things ever did escalate, it appeared at that time that maybe folks were older and wiser or Mr. Tran's utilization or the threat of calling the police would seem to prevent anything further from happening. [¶] And, certainly, the court has not heard any evidence to bolster any self-defense argument in the sense that the defendant knew or had any prior knowledge of this history between Mr. Tran and the decedent in this case. [¶] Also, the court would find under 352, it would not only necessitate an undue consumption of time, but would probably—yeah. So under 352, the court would also find that it's not admissible." The court stated the ruling was without prejudice, and it was willing to revisit the ruling in light of "fluidity and dynamics of these sorts of cases."

Before Le took the stand, his attorney renewed the request that the court allow evidence of Anh Tuan's two arson convictions and acts of violence against Tran. The court stated the previous ruling would stand.

The trial court did not abuse its discretion by excluding Le's proffered evidence. That Anh Tuan set a fire in 2000 and again in 2006 does not constitute

13

evidence of a "character or a trait of character" (§ 1103, subd. (a)) offered by Le to prove Anh Tuan engaged in conduct in conformity with that character or trait of character on the night of the stabbing. Anh Tuan did not set any fires on that night.

As for the evidence of Anh Tuan's violent conduct against Tran, the trial court did not err in concluding that evidence was not made admissible under section 1103, subdivision (a)(1). Tran testified Anh Tuan hit him three or four times in 2000 after Anh Tuan had been drinking a lot of beer (e.g., 12 to 13 beers in one sitting) and Tran refused to give him money to buy beer. Even if that evidence of conduct from many years before the stabbing was competent to show Anh Tuan had a character trait of becoming violent after drinking a lot of beer and being refused money to buy more, it is not relevant to prove Anh Tuan acted in conformity with that character trait on the night of the stabbing. There is no evidence Anh Tuan had consumed the amount of alcohol, which Tran described Anh Tuan drank in 2000 when he would become violent. Le did not deny any request by Anh Tuan for money.

Even more significantly, the trial court was well within its discretion to exclude the evidence under section 352. The evidence had minimal probative value. The jury was already aware that Anh Tuan was capable of engaging in physical altercations based on the testimony describing Le and Anh Tuan's fight at Saigon's Towing, which included Anh Tuan punching Le in the mouth. Le argued the proffered evidence was relevant to support his claim of self-defense. Such evidence was irrelevant to Le's claim that he acted in self-defense or imperfect self-defense based on his knowledge of Anh Tuan's violent past because he had no such knowledge. The very limited probative value offered by the proffered evidence was substantially outweighed by the undue prejudice, consumption of time, and confusion of issues, which would result in its admission. We find no error.

14

## III.

### EVEN ASSUMING THE SAIGON'S TOWING VIDEO DVD WAS ADMITTED IN ERROR, ANY SUCH ERROR WAS HARMLESS.

In his opening brief, Le argues the trial court overruled his counsel's lack of foundation objection and improperly admitted a video, as People's exhibit No. 58, that "purportedly came from Saigon Towing's closed-circuit television" (the DVD).

During his cross-examination of Le, the prosecutor introduced the DVD and Le's counsel objected to the DVD "as lacking foundation." The prosecutor stated he would call a witness to lay foundation and the court stated that "[b]ased on that offer of proof, it will be overruled." The prosecutor proceeded to ask Le questions about whom he recognized in the DVD. The prosecutor told Le, "[a]t some point if you recognize anybody, please let me know, Mr. Le." Le responded, "[i]t's too blurry. How can I recognize anything?" The prosecutor played and stopped the DVD, and asked Le if he recognized anyone. Le responded, "[n]o, I can't see their face. How can I recognize anyone?"

The prosecutor resumed playing the DVD and again stopped it, and asked if Le recognized "any of these people over here that appear to be involved in a scuffle off to the left?" Le responded, "[n]o, I don't." He was asked if he recognized D. "on the left group," and Le responded "[n]o." The prosecutor asked if Le recognized an individual wearing a long pair of baggy shorts. Le said, "[n]o."

Le testified one frame of the DVD appeared to show D. and N. standing "over on the right side next to the wall" and another frame showed E. and N. "standing over here to the left." Le also testified that one frame of the DVD showed what appeared to be D. having an argument with some adults and E. walking off toward a gate. He did not recognize an individual "facing off with a few individuals" and did not recognize anyone involved in a shoving match. Le also did not see a car pointed out to him in the DVD.

15

Le's counsel thereafter called Corporal Mark Lord of the Garden Grove Police Department as a witness. During the prosecutor's cross-examination of Lord, the prosecutor asked him where the DVD came from. Lord testified it came "[f]rom inside S[ai]gon Tow." When asked "were they able to extract either a tape-recording or some sort of memory device," Lord responded, "[t]hey did not know how to operate the equipment so we ended up taking the entire D.V.R. system."

During a hearing addressing whether certain exhibits would be received into evidence, Le's counsel objected to the DVD, stating, "a proper foundation was not laid for that. In addition, I believe that in introducing the entire video that was not shown in court, the D.A. skipped around some. My concern is with obviously with the—initially the proper foundation not having been laid, because we didn't hear from the individual who actually provided the DVD or the copy of the disc or DVD to the police department; and also the entire thing going back to the jury when that's not what they were shown during the testimony." The court overruled Le's counsel's objection, stating it found "that Corporal Lord laid sufficient foundation in which to warrant that exhibit be introduced into evidence."

In his opening brief, Le argues the trial court should have sustained his counsel's objection that the DVD lacked foundation to be admitted into evidence, arguing, "no evidence established who made the recording, the circumstances surrounding the making of the recording, whether the recording was made contemporaneously with the events of December 13, 2009, whether the tape had been tampered with or even whether the recording was authentic."

We do not need to decide whether a sufficient foundation was laid for the admission of the DVD because, even assuming the trial court erred by receiving the DVD into evidence, Le has failed to carry his burden of showing prejudicial error. In his opening brief, Le argues the admission of the DVD caused him prejudice because "the jury had no basis for identifying what they saw in the video, and therefore, could have

16

improperly attributed actions to [Le] or to [Anh Tuan]. The lack of sound also prevented the jurors from understanding the context of what they saw, and instead, encouraged them to leap to the conclusion that [Le] was an aggressor rather than a victim. Watching the visual of a fight likely angered and biased the jurors against [Le] and cast [him] as a dangerous and violent person."

The DVD shows some physical contact between individuals. Extensive testimony, however, was presented regarding Le's arguments and physical altercation at Saigon's Towing, and, in particular, Le's confrontations with Binh and Do, and the punching incident with Anh Tuan. Le does not explain how the DVD deviates in any way from the testimony that the jury had already heard on those events. Although Le testified the DVD is blurry and the faces are hard to see, and indeed the DVD is grainy, he does not suggest that the DVD reflects an inaccurate depiction of what transpired at Saigon's Towing. The DVD does not contain the fatal stabbing of Anh Tuan because the stabbing did not occur in Saigon's Towing.

Le's arguments that the DVD could have caused the jury to "improperly attribute[] actions" to Le or Anh Tuan, deprived the jury of necessary context, encouraged the jury to leap to the conclusion that Le was an aggressor rather than a victim, and could have angered and biased the jurors against Le as dangerous and violent are based on speculation. Consequently, Le has failed to demonstrate how admission of the DVD into evidence caused him prejudice.

IV.

THERE WAS NO CUMULATIVE ERROR.

Le argues the cumulative effect of the trial court's errors deprived him of a fair trial. We assumed, for purposes of our analysis, that the DVD was erroneously admitted into evidence, but concluded any such error was not prejudicial. We have rejected Le's other contentions of error. Accordingly, there can be no cumulative error. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

17

DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.